IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GREGORY HEATH,           )
                         )
    Plaintiff,            )
                         )
v.                       )
                         )  Case No. 3:09-cv-0138
METROPOLITAN LIFE        )  Judge Nixon/Brown
INSURANCE COMPANY,       )
                         )
    Defendant.            )
                         )

To:   The Honorable John T. Nixon

## REPORT AND RECOMMENDATION

Presently pending before the Magistrate Judge are both parties' cross-motions for judgment on the administrative record (DE 17, 19), their accompanying memoranda (DE 18, 20), and both parties' responses (DE 24, 25). The Magistrate Judge has also considered Defendant's Motion for Leave to File a Reply to Plaintiff's Response and Motion to Strike All Exhibits to Plaintiff's Response to Motion for Judgment on the Administrative Record (DE 26) and Plaintiff's Motion for Leave to File a Reply to Defendant's Response and Response to Defendant's Motion to Strike (DE 27).[1] For the reasons set forth below, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion for Judgment on the Administrative Record (DE 19) be **GRANTED in part** and **DENIED in part** and that Defendant's Motion for Judgment on the

---

[1] Because the Magistrate Judge has granted these Motions for Leave to File a Reply, the Magistrate Judge has considered the replies in writing this report and recommendation.

1

Administrative Record (DE 17) be **DENIED** and that the case be **REMANDED** to the plan administrator for further proceedings consistent with this Report and Recommendation. The Magistrate Judge further **GRANTS** both parties' Motions for Leave to File a Reply (DE 26, 27), **GRANTS** Defendant's Motion to Strike (DE 26), and **DENIES** Defendant's Response to Plaintiff's Combined Motion (DE 28).[2]

## I. Introduction

This civil action is brought pursuant to section 502(e) of the Employee Retirement Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Plaintiff filed his complaint on February 11, 2009 (DE 1), and Defendant filed under seal a copy of the administrative record on May 6, 2009 (DE 14). This matter was referred to the undersigned Magistrate Judge for a report and recommendation on the parties' respective motions for judgment on the record on September 2, 2009. (DE 22).

## II. Background

The record[3] reveals the following facts comprising Plaintiff's disability claim. Plaintiff Gregory Heath worked as a maintenance supervisor at the Honeywell International, Inc. chemical plant located in Metropolis, Illinois. As an employee at Honeywell, Plaintiff participated in the company's short-term and long-term disability plans, both administered by Defendant MetLife. Under the LTD plan,

---

[2] The Magistrate Judge believes that there has been more than enough analysis of the Administrative Record by both parties. The pleadings must end at some point, and enough is enough.

[3] All citations to the administrative record are designated as "AR." Citations to Plaintiff's LTD plan are designated as "Plan."

2

To be considered Disabled (or have a Disability), you must be:
- Receiving Appropriate Care and Treatment from a Doctor on a continuing basis for illness, pregnancy, or accidental injury and your condition must limit your ability to earn income; and

- More specifically, you will be considered Disabled if, solely because of Injury or Sickness, you are either (1) unable to perform all the material duties of your Regular Occupation or a Qualified Alternative; or (2) unable to earn 80% or more of your Indexed Base Monthly Pay.

(Plan 000008).

The medical and other evidence of record is summarized in Defendant's memorandum (DE 18 at 9-15) as follows:

Plaintiff worked as a Maintenance Foreperson for Honeywell until March 21, 2006. (AR 000325). Plaintiff applied for LTD benefits on or about August 10, 2006, and claimed that he was disabled due to physical and mental incapacitation, dystonia, jerks, pain & exhaustion. (Id.). On a Personal Profile submitted in conjunction with his LTD claim, Plaintiff described his condition as that of spinal myoclonus with dystonia, ataxia, mental impairment, memory loss, and CNS inflammation. (AR 000319). He stated that his daily activities consisted of attempting to get up and move around, that daily activity was limited, and varied depending on pain, mental ability, and movement ability or level of difficulty. (AR 000320). He further represented that he was the sole financial support for his family, that he was not really capable of even minor housework, and that he did not drive or take public transportation. (AR 000322). Plaintiff submitted records from his attending physician, Dr. William Hogancamp, a neurologist who Plaintiff began seeing at the onset of his purported symptoms. Dr. Hogancamp submitted an Initial Functional Assessment in which he diagnosed Plaintiff with memory loss secondary to segmental myoclonus. (AR 000333-334). Dr. Hogancamp stated that it was unknown when Plaintiff could return to work, but indicated that there was no limitation on Plaintiff's ability to lift 10 pounds or less, that Plaintiff could sit 8 hours per day intermittently, that he could carry 10 pounds or less 33% of his day (or occasionally), and that he could occasionally push/pull, pinch, grasp, drive, stand and walk. (AR 000334). By letter dated September 8, 2006, MetLife approved Plaintiff's claim for LTD benefits, effective September 22, 2006.
[....]
Dr. Hogancamp provided MetLife with notes from office visits dated July 5, 2006, September 12, 2006 and November 28, 2006. During all three visits, Dr. Hogancamp noted that: Plaintiff's extraocular movement were intact without nystagmus; his visual fields were full to confrontation; his facial movements were

3

symmetrical and normal; his speech was precise; that his extremity strength was normal in both his upper and lower extremities; his deep tendon reflexes were normal and symmetrical; his rapid alternating movements were unimpaired; and Plaintiff performed well and without dysmetria on finger-to-nose testing. (AR 00278-282). Additionally, Dr. Hogancamp noted that Plaintiff's gait was normal during his November 28, 2006 visit, that Plaintiff claimed his muscle spasms had improved, and that Plaintiff had learned how to control some of his muscle spasms. (AR 000279). Dr. Hogancamp indicated that Plaintiff was not taking any medication, and that his diagnosis remained that of segmental myoclonus. (Id).

[....]

In response, Dr. Hogancamp provided MetLife with notes from an office visit dated May 21, 2007, as well as the results of tests performed on a cerebrospinal fluid culture, including the results of a paraneoplastic autoantibody evaluation. Additionally, Dr. Hogancamp provided the results of a CT scan of the chest, conducted on June 6, 2007, as well as the results of MRIs of Plaintiff's brain, thoracic spine and cervical spine taken on that same date. (AR 000241-000268).

[....]

In his notes from Plaintiff's May 31, 2007 office visit, Dr. Hogancamp indicated that: Plaintiff's extraocular movement were intact without nystagmus; his visual fields were full to confrontation; his facial movements were symmetrical and normal; his speech was precise; his extremity strength was normal in both his upper and lower extremities; his deep tendon reflexes were normal and symmetrical; his rapid alternating movements were unimpaired; and Plaintiff performed well and without dysmetria on finger-to-nose testing. Dr. Hogancamp further indicated that Plaintiff had jerking of the trunk muscles causing peculiar body jerks, and that his gait was unsteady. (AR 000242). Dr. Hogancamp assessed Plaintiff as suffering from muscle cramps and myoclonus with abnormal cerebral spinal fluid. He opined that Plaintiff's symptoms could be an atypical presentation for multiple sclerosis, or could be a paraneoplastic syndrome. (Id.).

On or about June 22, 2007, MetLife received information by telephone from an anonymous source that Plaintiff was working at a health food store owned by Plaintiff's family called Heath Health Foods. (AR 000051). In light of this call, and given the normal results obtained from the objective tests conducted on the Plaintiff, MetLife enlisted the aid of a special investigator to gather additional information regarding the Plaintiff's activities, and to see whether his activities were consistent with his self professed purported physical and mental level of functionality.

The investigator conducted visual surveillance of the Plaintiff on June 29 and 30, 2007, as well as on July 10, 18 and 19, 2007. (AR 000204-218). Over the course of his investigation, the investigator observed Plaintiff to be active, confirmed that Plaintiff worked at Heath Health Foods, and that contrary to

4

Plaintiff's previous assertions, confirmed that Plaintiff was indeed able to bend, walk, carry, drive, lift, push and pull. (AR 000205).

[....]

On July 18, 2007, the investigator observed a vehicle matching the description of that owed [sic] by Plaintiff parked at Heath Health Foods. The investigator further observed Plaintiff appear at the rear of the store, at which time Plaintiff began to coil wire with both arms and load it into a vehicle. The investigator further observed Plaintiff bend over and pick up several 2 x 4 pieces of lumbar [sic], then load the same into a truck. The Plaintiff was observed to walk to the front of the truck, pick up a small box filled with various items and load it into the truck. Thereafter, the investigator observed Plaintiff drive his truck to a K-Mart store, and upon his arrival, unload several folding chairs from the truck and place them on a hand cart, which he pushed by himself into the K-Mart store. Approximately 20 minutes later, the Plaintiff was observed exit the K-Mart store carrying several folding chairs in each hand, then load the same into his truck. (AR 000205).

MetLife received the investigator's complete report of his video surveillance (the "Surveillance Report"), on or about September 11, 2007. (AR 000058). MetLife also obtained the investigator's surveillance video, which has also been submitted to the Court as part of the Administrative Record in this case. (AR 000414).

On September 10, 2007, MetLife sent a request to Dr. Hogancamp via facsimile, and requested that he provide MetLife with updated information concerning Plaintiff, including his current restrictions and limitations, and whether Dr. Hogancamp anticipated that Plaintiff could return to work in the near future. (AR 000058).

On or about September 14, 2007, MetLife received a letter from Dr. Hogancamp in which he stated that Plaintiff has an unusual inflammatory central nervous system disorder that causes poor memory, abnormal involuntary movements, fatigue, and poor balance, and that no more specific diagnosis would be forthcoming. He further indicated that Plaintiff's symptoms limit his physical and mental abilities, that Plaintiff could not work around heights, nor climb, carry, push or pull, that Plaintiff could not return to work at that point, and that it was not known if Plaintiff would ever be able to return to work. (AR 000201).

On September 19, 2007, MetLife faxed to Dr. Hogancamp a copy of the Surveillance Report, and requested that Dr. Hogancamp review the same and provide comments by October 3, 2007, regarding Plaintiff's previously reported purported physical restrictions in light of his demonstrated physical capabilities as noted in the Surveillance Report. (AR 000198). MetLife further advised Dr. Hogancamp that if it he did not respond by October 3, 2007, MetLife would take that to mean that Plaintiff was capable of medium work capacity. (Id.). Dr. Hogancamp did not respond to MetLife's September 19, 2007 letter. (Id.).

Thereafter, by letter dated October 12, 2007 (the "October 12 Letter"), MetLife informed Plaintiff that based on a review of his claim to determine if he was totally disabled from his job as defined by the Plan, MetLife was withdrawing Plaintiff's claim effective October 12, 2007, and that no further benefits would be due beyond October 11, 2007. (AR 000194-196). MetLife explained that although Dr. Hogancamp indicated in his September 14, 2007 letter that Plaintiff had limited physical and mental capabilities, was not able to climb, carry, push, or pull, and was not able to return to work, MetLife had nonetheless received information that Plaintiff was working at Heath Health Food Store. MetLife further explained that it had conducted surveillance on Plaintiff to get information concerning his work patterns, and that pursuant to the surveillance, MetLife had determined that Plaintiff's demonstrated activities were inconsistent with the restrictions provided by Dr. Hogancamp. Additionally, MetLife explained that it had provided Dr. Hogancamp with a copy of the Surveillance Report and asked him to comment on the same, but that it had not received any response from Dr. Hogancamp. (Id.).

MetLife further informed the Plaintiff that in order to perfect his LTD claim, he needed to provide complete medical evidence from the Mayo Clinic and Dr. Hogancamp showing that Plaintiff did not have the ability to perform his medium duty job. (Id.).

[....]

By letter dated November 27, 2007, Mrs. Heath contacted MetLife, represented that she was the legal agent for Plaintiff, and requested copies of his claim file, all information provided by "surveillance persons", information pertaining to all persons who contributed to the claim decision, and a copy of the Plan. (AR 000189).

By letter dated December 19, 2007, MetLife informed Plaintiff it had received a written request from his wife in connection with his LTD claim, and enclosed a copy of Plaintiff's entire LTD file, along with diary notes, and the Surveillance Report. MetLife also provided Plaintiff with the names of the individuals involved in the review of his claim. (AR 000185).

By letter dated February 10, 2008 (the "Appeal Letter"), Mrs. Heath again contacted MetLife and informed MetLife that the Appeal Letter should be considered the formal appeal of MetLife's denial of Plaintiff's LTD claim. (AR 000128). In the Appeal Letter, Mrs. Heath alleged she was including information on many of the medical professionals who had offered assistance in understanding Plaintiff's purported condition, information on purported "relevant medical conditions", information on Plaintiff's former position at Honeywell, comments on the medical records and surveillance records MetLife was provided, and information on Heath Health Foods. (AR 000128-182).

Thereafter, MetLife referred Plaintiff's claim file to Independent Physician Consultant ("IPC") Dr. Edward Weiland, M.D., a Neurologist. Dr. Weiland considered records dating back into March 2006, which included office

6

notes from Plaintiff's treating physicians, records from the Mayo Clinic, and the results of numerous objective tests. (AR 000111-117).
	[....]
	As part of his file review, Dr. Weiland conducted a telephone conference with Dr. Hogancamp on March 17, 2008. During that conversation, Dr. Hogancamp expressed to Dr. Weiland that while it was his impression that the Plaintiff had a neurologic disorder, he could not exclude the fact that the Plaintiff may have been embellishing some of his symptoms during the physical neurologic examinations performed under Dr. Hogancamp's direction, nor could he disallow the fact that the Plaintiff was exhibiting some evidence of symptom magnification. (AR 000114).
	Dr. Weiland noted that the physical examination findings reported by the Plaintiff's treating physicians did not indicate that the claimant had any specific mental status abnormalities where he would not be able to perform cognitive functions that would be considered part of Plaintiff's work responsibilities as a Maintenance Foreperson. Dr. Weiland further noted that the neurologic examination findings reported by the Plaintiff's various treating physicians and consultants did not indicate that the Plaintiff had any specific difficulties performing rapid alternating movement with his arms or legs, and that while the Plaintiff from time-to-time exhibited intermittent truncal spasms during examinations which appeared to be short-lived, the Surveillance Report indicated that the claimant was observed to perform activities of daily living without restrictions over multiple days of observation. (AR 000114).
	Based on his review and consideration of all the documentation submitted by Plaintiff, Mrs. Heath, and as contained in Plaintiff's LTD claim file, as well as on his experience and knowledge as a neurologist, Dr. Weiland opined that the Plaintiff does not suffer from a neurologic disorder which would support a functional impairment, and that Plaintiff should be able to perform activities of daily living as well as his work responsibilities as a Maintenance Foreperson. (AR 000114-115).
	As to the question of whether any functional limitations include any reduction in Plaintiff's ability to work full-time, Dr. Weiland indicated that it was his understanding that Dr. Hogancamp had been advised to submit further documentation to indicate the Plaintiff's clinical disability status after reviewing the Surveillance Report, but that Dr. Hogancamp had failed to submit any further documentation. Further, Dr. Weiland indicated that that medical information provided for review did not support the Plaintiff having any side effects, functional impairments nor cause any risk factors for the Plaintiff's safety from the medications that Plaintiff was taking. (AR 000096).
	Accordingly, based upon the documentation submitted for review, in conjunction with his discussion with Dr. Hogancamp, Dr. Weiland concluded that Plaintiff should be able to return to gainful employment under his preexisting job description, and that there was nothing in the administrative record to support that

7

Plaintiff was functionally impaired from a neurologic perspective beyond October 11, 2007. (AR 000114-115).

By letter dated March 25, 2008, MetLife informed Plaintiff it was continuing its review of his appeal, and that it had faxed a copy of Dr. Weiland's report to Dr. Hogancamp for his review and comment. MetLife requested that Plaintiff contact Dr. Hogancamp's office and arrange to have the doctor's response submitted to MetLife within 7 days, or by April 1, 2008. (AR 000108).

By letter dated April 1, 2008, Dr. Hogancamp contacted MetLife and indicated that he had not received Dr. Weiland's report. Dr. Hogancamp further indicated that Plaintiff had a definite, albeit undefined, progressive neurologic disorder that completely disables him. (AR 000105). With his letter, Dr. Hogancamp enclosed notes from an office visit dated April 1, 2008. In the notes, Dr. Hogancamp indicated that Plaintiff had repetitive muscle spasm throughout the course of the interview and examination which involved abdominal and diaphragm muscles, and which caused a groaning from Plaintiff. However, Dr. Hogancamp also noted that he did not observe any jerking movements. He further noted that: Plaintiff's extraocular movements were intact; his visual fields were full to confrontation; his facial movements were normal and symmetrical; his speech was precise; his extremity strength was normal and symmetrical, but difficult due to the spasms; his muscle tone was normal between the spasms; his deep tendon reflexes were normal and symmetrical but difficult due to spasms; and Plaintiff's rapid alternating movements were impaired by the spasms, as was his finger to nose testing, but that there was no dysmetria. Dr. Hogancamp assessed Plaintiff as suffering from diffuse muscle spasms, numbness in the hands and feet, and from memory loss. (AR 000106).

By letter dated April 16, 2008 which was faxed that same day to Dr. Hogancamp along with Dr. Weiland's report, MetLife requested that Dr. Hogancamp review Dr. Weiland's report and submit comments to MetLife regarding the same on or before April 23, 2008. (AR 000087).

In response, by letter dated April 23, 2008, Dr. Hogancamp indicated that Plaintiff has an unusual and debilitating disorder that is progressing and causing even more disability. With that letter, Dr. Hogancamp again included the notes made during Plaintiff's April 1, 2008 office visit. Dr. Hogancamp did not, however, make any comments regarding Dr. Weiland's report. (AR 000098-100).

Accordingly, by letter dated May 7, 2008, MetLife informed Plaintiff that based on all the information it had received in connection with Plaintiff's LTD claim, there was insufficient evidence that any impairment continued beyond October 11, 2007. MetLife further explained that benefits must be administered in accordance with the Plan, that the Plan required that Plaintiff's disability was defined and medically substantiated by the providers, that Plaintiff's file lacked clinical evidence to support impairments at a severity as to prevent Plaintiff from the ability to perform his regular job duties beyond October 11, 2007, and that accordingly, the original determination to terminate benefits beyond October 11, 2007 had been upheld in accordance with the terms of the Plan. (AR 000080-84).

Finally, MetLife informed Plaintiff that he had exhausted his administrative remedies under the Plan, and that therefore, no further appeals would be considered. (AR 000084). This suit followed.

### III. Discussion

**A. Standard of Review**

Because the LTD plan issued to Plaintiff provides that MetLife and the Plan Administrator "act as fiduciaries with the discretion and authority to interpret the terms of the Plan and determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan and applicable law," this Court reviews MetLife's determinations under the arbitrary and capricious standard. (Plan 000027). *See, e.g.*, *McCartha v. National City Corp.*, 419 F.3d 437, 441 (6th Cir. 2005). This is a deferential standard of review, and the administrator's decision should be upheld if it is "rational in light of the plan's provisions." *Univ. Hosps. Of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). The Sixth Circuit has described the arbitrary and capricious standard of review as requiring that the decision be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. Met. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd*, 128 S. Ct. 2343 (2008) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). The *Glenn* Court cautioned that the deferential nature of this standard does not render judicial review a mere formality, but in fact requires the court to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.* (quoting *McDonald v. Western-Southern Life Ins. Co*, 347 F.3d 161, 172 (6th Cir. 2003)).

**B. Application of the Arbitrary and Capricious Standard**

9

Plaintiff argues that MetLife's decision to deny his LTD benefits was arbitrary and capricious because: (1) MetLife operates under a conflict of interest because it both determines eligibility and pays benefits; (2) MetLife did not conduct a physical exam on Plaintiff; (3) MetLife did not adequately consider Plaintiff's medications; (4) MetLife disregarded the opinion of Plaintiff's treating physician and failed to explain why; (5) MetLife did not properly analyze clinical data Plaintiff submitted; (6) MetLife did not consider Plaintiff's chronic condition; and (7) MetLife did not discuss the Social Security Administration's award of benefits to Plaintiff in its denial. (DE 20 at 8). Defendant MetLife argues that: (1) there is essentially no objective evidence of Plaintiff suffering from a disabling condition or functional limitation; (2) Plaintiff's treating physician, Dr. Hogancamp, did not comment on the surveillance report and could not rule out that Plaintiff could be embellishing or magnifying symptoms; (3) MetLife's surveillance confirms that Plaintiff's actual functional limitations were less than represented; and (4) Plaintiff's other treating or consulting physicians made no disability determination. (DE 18 at 16-18). Defendant also states that it did not disregard the SSA decision. (DE 18 at 24). These arguments can be distilled into three basic categories: (1) conflict of interest; (2) problems with Dr. Weiland's paper review; and (3) the use of the video surveillance.

*1. Conflict of Interest*

Because MetLife plays the dual roles of determining whether an employee is eligible for benefits and paying those benefits out of its own pocket, there is a conflict of interest. This conflict should be considered "as a factor in determining whether the plan administrator has abused its discretion in denying benefits," and "the significance of the factor will depend upon the circumstances of the particular case." *Glenn*, 128 S.Ct. at 2346. The conflict, like any other

10

single factor, is used as a "tiebreaker when the other factors are closely balanced." *See id.* at 2351. The court must examine Plaintiff's additional claims to determine whether MetLife's decision was rational and supported by substantial evidence. In this case, the Magistrate Judge believes that this factor lends some weight to Plaintiff's argument but is not necessary to reach a decision.

*2. Dr. Weiland's Paper Review*

In the LTD Plan, MetLife apparently reserved the right to examine Plaintiff. *See* Plan 000023. MetLife opted to hire a neurologist, Dr. Weiland, to conduct a paper review of Plaintiff's file and to interview Dr. Hogancamp. While this alone is not dispositive that MetLife acted arbitrarily and capriciously, the "failure to conduct a physical examination - especially where the right to do so is specifically reserved in the plan - may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). This is especially true where a paper review's conclusions "include critical credibility determinations regarding a claimant's medical history and symptomology." *Id.* at 297, n. 6. *See also Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006) (physician conducting paper review made a "conclusory statement" about the claimant's pain, suggesting the physician did not believe the claimant's pain was "a credible complaint").

Here, it is troubling that Dr. Weiland apparently made decisions regarding Plaintiff's credibility without examining Plaintiff. He dismisses Plaintiff's complaints of mental impairment and memory loss, finding that no objective evidence exists. Dr. Weiland also appears to give great weight to the fact that Dr. Hogancamp "could not exclude the fact that the

11

claimant may have been embellishing some of his symptoms" or "disallow the fact that the claimant was exhibiting some evidence of symptom magnification." (AR 000096). This is far from an affirmative statement that Dr. Hogancamp believed Plaintiff was magnifying or embellishing his symptoms during office visits.

The adequacy of the paper review is also dependent on the other issues Plaintiff raises; namely, whether Dr. Weiland was provided with and considered all the information available. In his report, Dr. Weiland lists the medical records provided for his review. (AR 000092-94). These are consistent with the medical records contained in the Administrative Record. However, Dr. Weiland does not appear to have been aware that the SSA determined Plaintiff was disabled.[4]

A plan administrator's failure to consider an SSA determination of disability "is far from meaningless." *Calvert*, 409 F.3d at 294. *See also Glenn*, 461 F.3d at 669. While the "plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan," the plan administrator may not disregard the SSA determination, particularly where, as here, the plan requires the claimant to apply for SSA disability benefits to offset the plan's payment to the claimant. *Whitaker v. Hartford Life & Accident Ins. Co.*, 121 Fed.Appx. 86, 88 (6th Cir. 2005). Moreover, "the SSA determination of disability provides support for the conclusion that an administrative agency charged with examining a claimant's medical records found objective support for the disability determination." *Edwards v. Life Ins. Co. Of N. Am.*, 2009 U.S. Dist. LEXIS 3420 (E.D. Tenn., Jan. 16, 2009) (citing *Calvert*, 409

---

[4] MetLife also failed to cite the SSA determination in its letters to Plaintiff terminating Plaintiff's LTD benefits. (AR 000194, 000080).

12

Case 3:09-cv-00138   Document 29   Filed 11/23/09   Page 12 of 18 PageID #: 386

F.3d at 294). There is no evidence that Dr. Weiland knew of the SSA determination, even to disagree with it.[5]

Plaintiff also complains that Dr. Weiland failed to consider the side effects and interactions of medications he was taking. While the medical records Dr. Weiland reviewed clearly indicated that Plaintiff had been prescribed medications to treat his condition, Dr. Weiland does not provide any analysis of this information. When asked whether "the medical information provided for review support[s] employee having any side-effects, functional impairment, or causing risk factor for the clamant's safety" from medications, Dr. Weiland simply answers, "No." (AR 000096). Mrs. Heath's letter indicates that Plaintiff was taking two medications at the time of Dr. Weiland's paper review, Lyrica and Namenda. (AR 000140). Dr. Weiland may have believed from the information provided that Plaintiff did not suffer side effects or impairment from these medications; however, he provides no reasoning for his conclusion. The plan administrator must provide more than mere conclusory statements to support its findings.

MetLife opted to conduct a paper review of Plaintiff's file. This decision alone is not problematic. When combined with multiple failures to adequately consider all the evidence, however, the reviewing Court cannot blindly defer to the plan administrator's decision.

---

[5] The Magistrate Judge notes that there was additional evidence at the time of Dr. Weiland's report that may have indeed caused Dr. Weiland to reach a different conclusion than the SSA. However, there is no indication that he was aware that the SSA had awarded disability benefits to Plaintiff.

13

*3. Video Surveillance*

It is clear that video surveillance may be used by MetLife in reviewing a claim. *See*, *e.g.*, *Rose v. Hartford Fin. Serv. Gp.*, 268 Fed.Appx. 444, 451-52 (6th Cir. 2008). Video surveillance, though subject to interpretation, can be an important record of objective evidence. MetLife's video surveillance of the Plaintiff does show that Plaintiff's level of activity may not be consistent with his purported functional limitations. This is included as a reason for termination of Plaintiff's benefits in his original termination letter. (AR 000194-96). However, MetLife does not cite the video surveillance and report as reasons for denying Plaintiff's appeal. (AR 000080-84). Instead, it relies solely on the medical evidence submitted by Dr. Weiland and Dr. Hogancamp.[6]

In its motion, MetLife focuses on the surveillance report and video as strong, objective evidence that its determination was not arbitrary and capricious. The video, while not conclusive, does raise questions about the Plaintiff's disability. Because MetLife did not indicate reliance on the surveillance as a reason for denying Plaintiff's appeal, however, the Magistrate Judge believes the surveillance evidence is not compelling. It is impossible to determine from the Administrative Record to what extent MetLife relied on the surveillance evidence in its final conclusion.

*4. Additional Consideration*

The Magistrate Judge believes that this case should be remanded to the plan administrator for further action, based on the foregoing discussion. In addition, however, the

---

[6] Dr. Weiland's report does rely on the surveillance report, but the surveillance is not mentioned in the final termination letter.

Court is troubled by MetLife's reliance on Dr. Hogancamp's nonresponse as an affirmative position. In its letter to Dr. Hogancamp dated September 19, 2007, MetLife enclosed the surveillance report and stated, "If we do not hear from you by 10/3/07 we will take that to mean that you agree that your patient has the ability to do a medium duty occupation." (AR 000061). MetLife then affirmatively relies on Dr. Hogancamp's nonresponse in its original termination letter. (AR 000195). While MetLife does not cite the nonresponse in its final termination letter, it is nonetheless inherently unreasonable to rely on a physician's failure to reply as an affirmative response. It does not appear that MetLife even confirmed that Dr. Hogancamp had seen its letter.[7] The Magistrate Judge believes that this practice has no place in a "deliberate, principled reasoning process." *Glenn*, 461 F.3d at 666.

## C. Motion to Strike

The Defendant has moved to strike three affidavits submitted by Plaintiff. The affidavits purport to dispute the surveillance report's findings. (DE 25). While the Court may consider evidence outside the Administrative Record "only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The Magistrate Judge is not persuaded that these affidavits show either a lack of due process or MetLife's bias.

---

[7] It is also worth noting that MetLife attempted a similar stunt by sending Dr. Hogancamp a facsimile on March 25, 2008 that indicates he should respond within 7 days. Dr. Hogancamp correctly notes that this practice is "sneaky," but he could have obviated the need for this discussion by fully replying to MetLife's request for information in his letter or in any later communications. (AR 000105).

15

In addition, Plaintiff did not file these affidavits in a timely manner. Plaintiff knew of the basic contents of the surveillance report as early as October 11, 2007 and failed to dispute the report. (AR 000062). Plaintiff was certainly aware of the full contents of the surveillance report when the Administrative Record was produced on May 6, 2009. The Case Management Order also provides that any discovery should have been requested by July 6, 2009. (DE 11). Because Plaintiff was aware of the contents of the surveillance report and failed to file the affidavits during the discovery period, the Magistrate Judge will not consider the affidavits.

## IV. Conclusion

Based on the foregoing discussion, the Magistrate Judge believes that MetLife's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious. MetLife submitted a paper review with several failings, most notably the failure to consider and adequately analyze Plaintiff's medical record. The Magistrate Judge is not persuaded by the video surveillance, as MetLife chose to rely on the medical evidence alone in its final termination. Moreover, the Magistrate Judge believes that MetLife should not have considered Dr. Hogancamp's failure to reply to its letter as an affirmative statement. All of these failures cast doubt that MetLife's evaluation of Plaintiff's LTD benefits was "rational in light of the plan's provisions." *Univ. Hosps. Of Cleveland*, 202 F.3d at 846.

The Plaintiff urges the Court to award benefits based on the Administrative Record. The Magistrate Judge declines to award benefits, because there are factual issues to be resolved. *See*, *e.g.*, *Cooper v. Life Ins. Co. Of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) (finding "no need to remand this matter for additional consideration by LINA because of our conclusion that Cooper has clearly established that she is disabled under the Plan."); *Kovach et al. v. Zurich Am. Ins.*

16

*Co.*, 2009 WL 3790022, *15 (6th Cir., Nov. 13, 2009) (declining to remand for further proceedings because no unresolved factual issues remained). For example, the effect of Plaintiff's medication on his functional abilities has not been adequately analyzed. The Magistrate Judge instead recommends remand to the Plan Administrator for proceedings consistent with this report.

The Magistrate Judge therefore recommends that Plaintiff's motion for judgment on the administrative record be **GRANTED in part** and **DENIED in part**; that Defendant's motion for judgment on the administrative record be **DENIED**; and that Plaintiff's claim for LTD benefits be **REMANDED** to the Plan Administrator for further consideration consistent with this report and recommendation. The Magistrate Judge also **GRANTS** Defendant's Motion to Strike Plaintiff's Affidavits.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 23rd day of November, 2009.

/S/ Joe B. Brown
Joe B. Brown, United States Magistrate Judge